UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANTHONY PEREZ,                                      :

               Plaintiff,          :          13 Civ. 3713 (AJP)

         -against-                 :          **OPINION & ORDER**

CAROLYN W. COLVIN, Commissioner of                 :
Social Security,
                       :

            Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Anthony Perez, represented by counsel, brings this action pursuant to §

205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the

Commissioner of Social Security (the "Commissioner") denying him Supplemental Security Income

("SSI") benefits.  (Dkt. No. 2: Compl.)  Presently before the Court are the parties' cross-motions for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 20: Perez Motion; Dkt. No.

25: Comm'r Motion.)  The parties have consented to decision by a Magistrate Judge pursuant to 28

U.S.C. § 636(c).  (Dkt. No. 24: Consent Form.)

        For the reasons set forth below, the Commissioner's motion is <u>GRANTED</u> and

Perez's motion is <u>DENIED</u>.

<b><u>FACTS</u></b>

**<u>Procedural Background</u>**

        On August 21, 2009, Perez applied for SSI benefits, alleging that he was disabled

since September 9, 1997.  (Dkt. No. 14: Administrative Record filed by the Comm'r ("R.") 164-70,

175, 190.)  Perez alleged disability related to post-traumatic stress disorder ("PTSD"), lead-induced

dementia resulting from ingestion of lead-based paint chips, dementia resulting from head trauma, depression, nerve damage in the middle fingers of both hands, and nerve issues in his back with lower back pain.  (R. 190.)  On January 7, 2010, the Social Security Administration ("SSA") found that Perez was not disabled, and denied his application.  (R. 57, 78-81.)  Perez requested an administrative hearing.  (R. 82-84.)

Administrative Law Judge ("ALJ") Michael Friedman conducted the hearing on August 16, 2010.  (R. 40-56.)  On August 26, 2010, ALJ Friedman issued a written decision finding that Perez was not disabled.  (R. 58-68.)  Perez appealed, and the Appeals Council vacated ALJ Friedman's decision and remanded the case for additional proceedings to include the testimony of a vocational expert to determine the limitations of Perez's occupational base.  (R. 72-75.)  On October 17, 2011, ALJ Friedman conducted a second hearing with vocational expert Victor Alberigi.  (R. 5-22.)  On November 7, 2011, ALJ Friedman again found Perez not disabled.  (R. 25-36.)  ALJ Friedman's second decision became the Commissioner's final decision when the Appeals Council denied Perez's request for review on April 30, 2013.  (R. 1-3.)

On February 18, 2014, Perez filed a motion for judgment on the pleadings.  (Dkt. No. 20: Perez Motion.)  On March 18, 2014, the Commissioner filed a cross-motion for judgment on the pleadings.  (Dkt. No. 25: Comm'r Motion.)  On April 8, 2014, Perez filed a reply memorandum opposing the Commissioner's motion.  (Dkt. No. 29: Perez Reply Br.)

The issue before the Court is whether the Commissioner's decision that Perez was not disabled is supported by substantial evidence.

**Non-Medical Evidence**

    **Hearing Evidence**

        Perez, born on August 10, 1962, was thirty-five years old at the September 9, 1997 alleged onset of his disability.  (R. 164.)  Perez attended school in through the ninth or tenth grade, speaks and reads English, but neither graduated high school nor received his GED.  (R. 47, 198.) He received some vocational training as a health care aide.  (R. 47.)  Perez lives alone in a Bronx apartment.  (R. 42.)  However, for much of his life since 1996, Perez either has been homeless, in prison, or a transient guest at social service facilities.  (R. 223.)

        From 1992 to 1993, Perez worked in construction as a "[s]killed [l]aborer," and from 1993 to 1994, he worked in a factory.  (R. 179.)  Perez again worked in construction as a carpenter in September-October 1997.  (R. 179.)  Perez stated that he lifted wheelbarrows and installed insulation, sheet rock and wooden boards.  (R. 53-54.)  Perez stated that he would not be able to perform these job functions in his present state, particularly in light of his inability to grip with his hands.  (R. 54-55.)  He worked as a health care aide in 2002, but stopped because his hands were broken.  (R. 47.)  At the August 16, 2010 hearing, Perez stated that a year before he had worked in construction for a few months, but had to stop because of his ailments.  (R. 42-43.)

        At the hearing, Perez complained of neck and shoulder pain.  (R. 8,12.)  Perez stated that he feels sharp pain in his back after sitting for half an hour.  (R. 12-13.)  He stated that three days a week, the pain in his back prevents him from cleaning or cooking.  (R. 13.)  Perez had physical therapy, but it did not help.  (R. 14, 43.)  Resting and lying down do not help the pain.  (R. 43.)  Perez stated that his back pain started in 1994 when he was hit by a car while riding his bike. (R. 52.)  Perez was assaulted during a robbery and required a five-hour surgery on both of his hands and staples in his head and back.  (R. 44, 48.)  Doctors removed a bone from Perez's middle finger

on his left hand.  (R. 48.)  Perez has scarring on his right hand from the assault and from a childhood injury from a razor blade.  (R. 48-49.)

Perez stated that he has problems standing, sitting and walking; he could stand for five minutes, sit for ten minutes and walk five blocks.  (R. 9-10, 44-45.)  Perez uses public transportation, goes grocery shopping, and cleans his apartment by himself.  (R. 10, 45.)  Perez's cooking is limited to simple meals like soup or pasta.  (R. 50.)  Perez has no hobbies or special interests and does not read, but he does watch television.  (R. 10, 45-46.)  Perez cannot open a jar or hold up a gallon of milk.  (R. 49.)  Perez cannot make a fist with his left hand.  (R. 49.)  Perez stated he could not lift a ten pound grocery bag, but could lift a one to two pound bag.  (R. 45.) Perez stated that if offered a job to clean offices at night, he could not do that kind of work because of his back problems.  (R. 11.)  Perez also stated that he could not perform an assembly job because he cannot stand for long periods of time.  (R. 11, 45.)

Perez suffers from depression and PTSD.  (R. 8.)  He is easily angered or upset.  (R. 8.)  Perez finds it hard to be around people he does not know.  (R. 9.)  Perez has been seeing a psychiatrist and a therapist for his depression and PTSD, each once or twice a month.  (R. 8-9, 44.) Perez stated that his concentration, memory and focus are poor.  (R. 9, 44.)[1]

---

[1]    On September 21, 2009, SSA employee Maria Ruiz assisted Perez with his benefits application and recorded her observations of Perez.  (R. 175-78.)  During a face-to-face interview with Perez, Ruiz did not perceive Perez have difficulty sitting, standing, walking, using his hands or writing.  (R. 176-77.)  Ruiz observed no problems with Perez's reading, understanding, coherency or concentration.  (R. 177.)  She noted that he was dressed casually and well groomed.  (R. 177.)

**Medical Evidence**

**Prior to August 21, 2009[2/]**

**Mental Impairments**

**Common Ground Housing Assistance**

On December 5, 2007, Dr. Dillon Euler and Nurse Practitioner Alexandra Back performed a psychiatric examination of Perez as part of Perez's housing application. (R. 221-26.)[3/] Perez was homeless, drifting between Flatbush, Crown Heights, and Park Slope for the past three to four years. (R. 221, 223.) Perez reported that he had been in jail for the previous two months due to an assault at the public assistance office. (R. 221, 223.) Perez described the experience as traumatic and expressed guilt and frustration over this regression. (R. 221.) Perez denied thoughts of suicide and homicide, visual and auditory hallucinations, and paranoid ideation, but continued to ruminate over those who have assaulted or abused him in the past. (R. 221.) Perez presented with feelings of depression, daily sadness, irritability and insomnia. (R. 221.) Perez reported severe disturbances in concentration and hyper-vigilance. (R. 221.) Perez had not used marijuana or other drugs since September 2007. (R. 221.)

_____

[2/]   This is the date upon which Perez filed his SSI claim. (See page 1 above.) The Commissioner argues that evidence of injury prior to this date is outside the relevant period for consideration because "[t]he earliest month for which SSI benefits can be paid is the month following the month in which the application was filed." (Dkt. No. 26: Comm'r Br. at 2 (citing 20 C.F.R. § 416.335).) However, while Perez may not be entitled to benefits for the time preceding his filing, the evidence of his injuries prior to that date is to be considered in making the final disability determination. See 20 C.F.R. § 404.1512(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary . . . .").

[3/]   Nurse Practitioner Back had examined Perez in September 2007, diagnosing him with PTSD and dementia. (R. 222.)

Nurse Practitioner Back administered the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"),[4] which evidenced that Perez suffers from extensive cognitive impairment in the areas of immediate and delayed memory, attention and language.  (R. 221-22, 225.)  His immediate memory ranked in the first percentile and his delayed memory ranked in the one-tenth percentile.  (R. 225.)  Perez stated that he had eaten lead-based paint as a child, and always felt "'idle'" and "'out of focus.'"  (R. 222.)  Perez reported that he passed his classes in school, but had extreme difficulty concentrating.  (R. 222.)  Perez sought psychiatric treatment only once before this examination.  (R. 222.)  Nurse Back concluded that Perez's "[f]und of knowledge [was] below average" and that he was "of borderline intelligence."  (R. 225.)  The report also stated that Perez "suffers debilitating problems with impulse control and lack of ability to determine [the] consequences of [his] actions."  (R. 225.)  The evaluation report indicated that Perez has multiple visible scars on his head, face, and hands, that Perez was appropriately groomed, and that he was pleasant and cooperative.  (R. 224.)  Perez's speech was normal in rate, rhythm, and volume.  (R. 224.)  Perez's thought process was logical, linear, and coherent, with the ability to abstract.  (R. 224.)

Dr. Euler and Nurse Practitioner Back diagnosed Perez with chronic PTSD, mild major depressive episode, and lead-induced persisting dementia and dementia due to a head trauma on Axis I, mandibular fracture, bilateral surgical repair of his hands, arthritis in his knees, and chronic neck and back pain on Axis III, and a Global Assessment of Functioning ("GAF") score of

---

[4]     Although this information is contained in the December 2007 report, the RBANS test was administered in September 2007.  (R. 225.)  RBANS "was developed for the dual purposes of identifying and characterizing abnormal cognitive decline in the older adult and as a neuropsychological screening battery for younger patients. . . . RBANS is effective at both detecting and characterizing dementia of different etiologies."   National Center for Biotechnology Information, http://www.ncbi.nlm.nih.gov/pubmed/9845158 (last visited May 30, 2014).

40 on Axis V. (R. 226.)[5/]  They recommended that Perez be placed in supportive housing and referred Perez for cognitive remediation of his dementia.  (R. 226.)  They prescribed Lexapro and Ambien.  (R. 226.)

On August 12, 2008, Dr. Euler and Nurse Practitioner Back performed an updated psychiatric evaluation of Perez.  (R. 227-28.)  Perez reported situational depression and poor impulse control.  (R. 227.)  Perez stated that he continues to suffer from severe concentration disturbances, feelings of detachment from others, and insomnia.  (R. 227.)  Perez had followed his Lexapro and Ambien regimen until April 2008 when he left transitional housing and returned to the streets.  (R. 227.)  Perez reported that the medications were effective.  (R. 227.)

The evaluation report indicates that Perez was appropriately groomed, pleasant and cooperative.  (R. 229.)  Perez's speech was normal in rate, rhythm, and volume.  (R. 229.)  Perez's thought process was logical, linear, and coherent, with the ability to abstract.  (R. 229.)  His insight and judgment were good at the time of the evaluation.  (R. 230.)  Dr. Euler and Nurse Practitioner Back diagnosed Perez with a cognitive disorder, lead-induced dementia and dementia from head trauma, chronic PTSD, cannabis and alcohol dependence, and mild major depressive episode on Axis I, mandibular fracture, bilateral surgical repair of his hands, arthritis in his knees, and chronic

---

[5/]     The multi axial system of analysis is used to assess a patient's physical and mental condition along five axes, each referring to a specific domain of information.  Axis I pertains to clinical disorders; Axis II pertains to personality disorders; Axis III pertains to general medical conditions; Axis IV pertains to environmental and psychosocial problems; and Axis V references the patient's GAF.  A GAF of 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  Diagnostic & Statistical Manual of Mental Disorders 27-34 (4th ed. rev. 2000).

neck and back pain on Axis III, and a GAF score of 50 on Axis V.  (R. 230.)[6/]  Dr. Euler and Nurse

Practitioner Back recommended continued psychiatric treatment, medication, and substance abuse

treatment and support.  (R. 231.)

### Physical Impairments

### Jamaica Hospital Medical Center

On February 21, 2008, Perez presented at Jamaica Hospital Medical Center

("JHMC") complaining of pain, parasthesia and limited range of motion in both hands.  (R. 247.)

The injuries stemmed from a 2006 assault where Perez was beaten with a metal pipe.  (R. 247.)  X-

rays revealed an old healed fracture of the fifth metacarpal on the right hand, with significant callous

formation at the fracture site.  (R. 247-48.)  The rheumatoid factor was negative.  (R. 247, 249.)  The

remaining bony structures in Perez's hands were within the normal limits and the joint spaces were

well-maintained.  (R. 248.)  The consultation report indicated a plan of occupational therapy twice

a week for four weeks.  (R. 247.)[7/]

### After August 21, 2009

### Mental Impairments

### Common Ground Housing Assistance

On October 2, 2009, Dr. Euler and Nurse Practitioner Back completed a New York

State Office of Temporary and Disability Assistance questionnaire concerning Perez's mental ability

---

[6/]    A GAF score of 50 indicates serious symptoms, such as suicidal ideation or severe
obsessional rituals, or any serious impairment in social, occupational, or school functioning,
such as not having friends or not being able to keep at job.  Diagnostic & Statistical Manual
of Mental Disorders 27-34 (4th ed. rev. 2000).

[7/]    There is no documentary evidence in the record that Perez engaged in the prescribed
physical therapy.

to function. (R. 211-18.) Referencing their findings from their examinations in December 2007 and August 2008 (the last time they saw Perez), Dr. Euler and Nurse Practitioner Back concluded that Perez had a "poor" ability to perform work-related mental activities. (R. 216.) They noted that Perez suffered from limitations in understanding and memory, sustained concentration and persistence, social interaction and adaption. (R. 217, 219-31.)

### Consultative Examinations

On November 20, 2009, Dr. Herb Meadow consultatively examined Perez for the New York Division of Disability Determination. (R. 255-58.) Perez had entered psychiatric treatment six months earlier and currently was seeing Dr. Santilli at Premosa once a month. (R. 255.) Perez presented with complaints of insomnia, depression, moodiness, irritability, low energy, diminished self-esteem and difficulty concentrating. (R. 255.) Perez had passive suicidal thoughts, but no intent. (R. 255.) He had flashbacks and nightmares about his 2006 assault. (R. 255.)

Dr. Meadow's mental status evaluation revealed a coherent and goal-directed thought process and intact attention and concentration. (R. 256.) Perez was able to repeat three out of three objects immediately and after five minutes during a memory test. (R. 256.) Perez had average cognitive functioning with a general fund of information appropriate to his experience. (R. 257.) Perez's insight and judgment were fair. (R. 257.) Dr. Meadow noted that Perez takes care of his personal hygiene, does household chores and socializes with friends and family. (R. 257.) Dr. Meadow's medical source statement says "[t]he claimant would be able to perform all tasks necessary for vocational functioning. The results of the exam appear to be consistent with psychiatric problems, but in itself does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (R. 257.) Dr. Meadow diagnosed PTSD, adjustment disorder with depressed mood, and alcohol and cannabis abuse/dependence in remission on Axis I,

and hand pathology, peripheral neuropathy, and back and neck pain on Axis III.  (R. 257.)  Dr. Meadow recommended that Perez continue with his psychiatric treatment.  (R. 257.)

On January 4, 2010, Dr. L. Meade, a psychologist from the New York State Division of Disability Determinations, performed a psychiatric review of Perez.  (R. 274-87.)  Dr. Meade concluded without elaboration that Perez's mental impairment was not severe.  (R. 274.)

### South Bronx Mental Health Council

On April 30, 2010, Perez presented at the South Bronx Mental Health Council complaining of depression, anxiety, fear of being assaulted, poor memory and bad dreams.  (R. 298-300.)  Perez stated that he had abstained from alcohol and marijuana for the past two years.  (R. 298-99.)  Perez had seen a chiropractor for his back.  (R. 299.)  The screening therapist diagnosed depression, PTSD, back and neck problems and a history of homelessness.  (R. 300.)  Perez's GAF score was 55.  (R. 300.)[8/]  A subsequent treatment evaluation on May 28, 2010 revealed anxiety and paranoia, specifically Perez's belief that others were targeting him.  (R. 335-36.)

On June 9, 2010, psychiatrist Dr. Margaret Chu performed a mental status evaluation.  (R. 302-19.)  Perez appeared well-groomed with clearly articulated speech and no motor behavior abnormalities.  (R. 302, 316.)  Dr. Chu noted that Perez was cooperative but demanding and manipulative.  (R. 304.)  Perez indicated that he believed he had dementia because of his forgetfulness, but Dr. Chu stated that Perez had no difficulty with concentration or attention.  (R. 318.)  Perez had an average fund of knowledge and average intelligence.  (R. 318.)  Dr. Chu

---

[8/]     A GAF score of 51-60 indicates moderate symptoms, such as flat affect or circumstantial speech or occasional panic attacks, or moderate difficulty in social, occupational, or school functioning, such as having few friends or conflicts with peers or co-workers.  Diagnostic & Statistical Manual of Mental Disorders 27-34 (4th ed. rev. 2000).

diagnosed Perez with depression, a personality disorder and paranoid features.  (R. 319.)  Perez's GAF score was 60.  (R. 319.)

On July 12, 2011, Dr. Chu performed a follow-up evaluation.  (R. 339.)  Dr. Chu noted that Perez seemed less anxious and since the last evaluation no irritability or psychotic features were reported.  (R. 339.)  Perez remained isolated because his friends liked to drink and use drugs.  (R. 339.)  Perez's GAF score was 60-65.  (R. 339.)[9]

**Physical Impairments**

**Consultative Examinations**

Dr. Dipti Joshi consultatively examined Perez for the New York State Division of Disability Determinations on November 20, 2009.  (R. 259-63.)  Perez presented with numbness, tingling, and sharp pain in both hands, subjectively rated as seven out of ten in both hands.  (R. 259.)  Perez also complained of intermittent and spasmodic nonradiating neck and lower back pain, rated as five out of ten, but worse when the weather changes.  (R. 259.)  Perez reported Lipitor, Lexapro, Lyrica, Zolpidem and Skelaxin as his current medications.  (R. 260.)

Dr. Joshi's report indicated that Perez lives alone, cooks every day, cleans every week and does laundry and grocery shopping every two weeks.  (R. 260.)  Perez showers and dresses himself daily.  (R. 260.)  Perez likes to watch TV and socialize with friends.  (R. 260.)  Perez's gait and stance were normal, and he appeared to be in no acute distress.  (R. 260.)  Perez was able to rise from a chair without difficulty and did not require assistance changing for the exam or getting on or off the exam table.  (R. 260.)  Perez's lumbar spine showed full flexion and extension, full right

---

[9]     A GAF score of 61-70 indicates some mild symptoms, such as a depressed mood or mild insomnia, or some difficulty in social, occupational, or school functioning, "but generally functioning pretty well."  Diagnostic & Statistical Manual of Mental Disorders 27-34 (4th ed. rev. 2000) (emphasis added).

lateral flexion and left lateral flexion approximately thirty degrees, and full rotary movement bilaterally. (R. 261.) Perez reported mild point pain in his cervical spine region around C5 to C7. (R. 261.) The cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (R. 261.) An x-ray noted degenerative changes. (R. 262, 265.) Perez had full range of motion in both his shoulders, elbows, forearms and wrists. (R. 261.) However, Perez was unable to flex his third digit on his left hand and had difficulty fully flexing his fifth digit on his right hand. (R. 261.) Perez's grip strength in his left hand measured four out of five, and he was able to zip, button and tie with that hand. (R. 262.) Fine motor activity was preserved in both hands. (R. 262.)

Dr. Joshi concluded that Perez had neuropathic symptoms in both hands with limited grip strength in the left hand, intermittent and spasmodic neck and lower back pain, and depression. (R. 262.) Dr. Joshi described Perez's limitation as moderate in gripping with his left hand, and pushing, pulling, carrying, and lifting with both hands. (R. 262.)

On January 4, 2010, Dr. Patelunas completed a physical residual functional capacity assessment of Perez. (R. 268-73.) Dr. Patelunas concluded that Perez could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and stand, sit, and/or walk for a total of about six hours in an eight hour workday. (R. 269.) Perez's capacity to push and/or pull, including operating hand and foot controls, was unlimited. (R. 269.) Accordant with Dr. Joshi's findings, Dr. Patelunas noted that Perez's grip strength was four out of five in the left hand, he could not flex the third digit on his left hand, and he had difficulty flexing the fifth digit on his right hand. (R. 269.)

**Jamaica Hospital Medical Center**

On October 10, 2011, neurologist Dr. Osafradu Opam stated that Perez had been treated for chronic neck and lower back pain, muscle spasms, and fibromyalgia.  (R. 343.)

**Vocational Expert Testimony**

At the second ALJ hearing on October 17, 2011, consistent with the Appeals Council's remand instructions, ALJ Friedman asked vocational expert Victor Alberigi whether work existed in significant numbers for an individual who was restricted to low-stress, simple work that required only occasional contact with supervisors and co-workers and minimal contact with the public.  (R. 16.)  Alberigi replied that such work existed in the form of an office or hotel cleaner, of which 1.5 million positions existed in the national economy with over thirty thousand in the greater New York metropolitan area.   (R. 16-17.)   Alberigi testified that those jobs were "illustrative" and there were other available jobs as well.  (R. 17.)  However, if Perez were to miss more than two or three days of work a month on an ongoing basis, there would not be jobs available. (R. 19-20.)

**ALJ Friedman's November 7, 2011 Decision**

On November 7, 2011, ALJ Friedman issued a second written decision denying Perez's application for SSI benefits.  (R. 25-36.)

ALJ Friedman applied the appropriate five-step legal analysis. (R. 29-35.) First, ALJ Friedman found that Perez had "not engaged in substantial gainful activity since August 21, 2009, the application date."  (R. 30.)  Second, he determined that Perez had the severe impairments of major depressive disorder and PTSD.  (R. 30.)  However, ALJ Friedman determined that Perez's mild cervical degenerative disc disease and his post-assault hand injuries were nonsevere physical

impairments.  (R. 30.)  Third, ALJ Friedman found that Perez did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (R. 30-31.) ALJ Friedman determined that Perez had the residual functional capacity to perform a full range of low-stress, simple work at all exertional levels that allows for occasional contact with supervisors and co-workers, and minimal contact with the general public.  (R. 31.)

ALJ Friedman made a credibility determination about Perez's subjective pain allegations, finding that Perez's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 32.) ALJ Friedman noted that there was no objective medical evidence of any severe physical impairment.  (R. 33.)

ALJ Friedman gave consultative examiner Dr. Joshi's findings that Perez had moderate limitation in gripping with his left hand and pushing, pulling, carrying, and lifting with both hands "little weight" because they were "inconsistent with [Perez's] reported level of functioning," that is, that Perez "can cook, clean, do laundry, and shop," as well as shower and dress himself daily.  (R. 33.)  ALJ Friedman also gave Dr. Patalunas' consultative opinion as to Perez's physical impairment "little weight," finding it "inconsistent with the record as a whole."  (R. 33.) ALJ Friedman further noted that the Appeals Council, in reviewing Perez's first appeal, "held that the evidentiary record does not support a medically determinable back impairment" and that "there is little, if any, evidence of a severe physical impairment causing work related functional limitations."  (R. 33.)

Further, while ALJ Friedman acknowledged that there was evidence of psychiatric impairments, he found that those impairments did not inhibit Perez's capacity to perform "the mental

demands of basic unskilled work." (R. 33.) ALJ Friedman gave "little weight" to Dr. Euler and Nurse Practitioner Back's 2007-08 assessment that Perez "has a poor ability to perform work related me[n]tal activities" and that he "suffers significant cognitive impairment" because the "treatment notes end in 2008, prior to the application date, and there is no indication that the severity level of his impairment has remained the same." (R. 34.) To the contrary, ALJ Friedman noted that Perez's "activities of daily living do not support [the finding of] limited function." (R. 34.) However, ALJ Friedman also gave "little weight" to consultative examiner Dr. Meadow's finding that Perez "would be able to perform <u>all</u> tasks necessary for vocational functioning" because Dr. Meadow failed to consider Perez's subjective complaints. (R. 34, emphasis added.) The South Bronx Mental Health Council records indicated depression and PTSD, anxiety, some paranoid ideation and preoccupations, and improving GAF scores in the moderate range. (R. 33-34.)

At the fourth step, ALJ Friedman determined that Perez had no past relevant work. (R. 34.) At the fifth and final step, ALJ Friedman found that, "[c]onsidering [Perez's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Perez] can perform," based on the vocational expert's testimony. (R. 35.) ALJ Friedman concluded that Perez was not "under a disability, as defined in the Social Security Act, since August 21, 2009, the date the application was filed," through the date of the decision, November 7, 2011. (R. 35.)

On April 30, 2013, the Appeals Council denied Perez's request for review of ALJ Friedman's decision and it became the Commissioner's final decision. (R. 1-4.)

# ANALYSIS

## I.    THE APPLICABLE LAW

### A.    Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[10/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of

---

[10/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v.

Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[11/]

   In determining whether an individual is disabled for disability benefit purposes, the

Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions

based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or

others; and (4) the claimant's educational background, age, and work experience." Mongeur v.

Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[12/]

## B. **Standard Of Review**

   A court's review of the Commissioner's final decision is limited to determining

whether there is "substantial evidence" in the record as a whole to support such determination. E.g.,

42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011); Green-

Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).[13/]  "'Thus, the role of the district court is

---

[11/] See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[12/] See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

[13/] See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[14]

    The Supreme Court has defined "substantial evidence" as '"more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[15] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to '"substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[16]

---

[14] See also, e.g., Karle v. Astrue, 12 Civ. 3933, 2013 WL 2158474 at *9 (S.D.N.Y. May 17, 2013) (Peck, M.J.), report & rec. adopted, 2013 WL 4779037 (S.D.N.Y. Sept. 6, 2013); Santiago v. Astrue, 11 Civ. 6873, 2012 WL 1899797 *13 (S.D.N.Y. May 24, 2012) (Peck, M.J.); Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 13, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[15] See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[16] See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'"  E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[17]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[18]

### C.     The Treating Physician Rule

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

---

[17]  See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barnhart, 335 F.3d at 106; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[18]  See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d at 106; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

20 C.F.R. § 404.1527(d)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700

(2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254

F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).[19]

       Further, the regulations specify that when controlling weight is not given a treating

physician's opinion (because it is not "well supported" by other medical evidence), the ALJ must

consider the following factors in determining the weight to be given such an opinion: (1) the length

of the treatment relationship and the frequency of examination; (2) the nature and extent of the

treatment relationship; (3) the evidence that supports the treating physician's report; (4) how

consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the

physician in contrast to the condition being treated; and (6) any other factors which may be

significant.  20 C.F.R. § 404.1527(d)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d

Cir. 2013); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010); Foxman v.

Barnhart, 157 F. App'x at 346-47;  Halloran v. Barnhart, 362 F.3d at 32; Shaw v. Chater, 221 F.3d

at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d at 118; Schaal v. Apfel, 134 F.3d at 503.[20]

---

[19]   See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346 (2d Cir. 2005); Tavarez v.
Barnhart, 124 F. App'x 48, 49 (2d Cir. 2005); Donnelly v. Barnhart, 105 F. App'x 306, 308
(2d Cir. 2004); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Green-Younger v.
Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5
(2d Cir. 2002); Jordan v. Barnhart, 29 F. App'x 790, 792 (2d Cir. 2002); Bond v. Soc. Sec.
Admin., 20 F. App'x 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir.
2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Comm'r of Soc. Sec.,
143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

[20]   See also, e.g., Kugielska v. Astrue, 06 Civ. 10169, 2007 WL 3052204 at *8 (S.D.N.Y.
Oct. 16, 2007); Hill v. Barnhart, 410 F. Supp. 2d 195, 217 (S.D.N.Y. 2006); Klett v.
Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y. 2004); Rebull v. Massanari, 240 F. Supp. 2d
265, 268 (S.D.N.Y. 2002).

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Cichocki v. Astrue, 534 F. App'x at 75; Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to Snell but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

### D.   The ALJ's Duty to Develop the Record

It is the "well-established rule in [the Second] circuit" that the ALJ must develop the record, even where, as here, the claimant was represented by counsel:

> Even when a claimant is represented by counsel, it is the well-established rule in our circuit "that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and brackets omitted)[,

cert. denied, 559 U.S. 962, 130 S. Ct. 1503 (2010)]; accord Butts v. Barnhart, 388
F.3d 377, 386 (2d Cir. 2004), [amended on other grounds], 416 F.3d 101 (2d Cir.
2005); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996); see also Gold v. Sec'y of
Health, Educ. & Welfare, 463 F.2d 38, 43 (2d Cir. 1972) (pro se claimant).  Social
Security disability determinations are "investigatory, or inquisitorial, rather than
adversarial." Butts, 388 F.3d at 386 (internal quotation marks omitted).  "[I]t is the
ALJ's duty to investigate and develop the facts and develop the arguments both for
and against the granting of benefits." Id. (internal quotation marks omitted); accord
Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999).

Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009).[21/]

## II.   APPLICATION OF THE FIVE-STEP SEQUENCE TO PEREZ'S CLAIM

### A.   Perez Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Perez was engaged in substantial gainful activity after

his application for SSI benefits.  "Substantial gainful activity" is defined as work that involves

"doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or

profit."  20 C.F.R. § 404.1510.  Because ALJ Friedman's conclusion that Perez did not engage in

substantial gainful activity during the applicable time period (see page 13 above) benefits Perez, the

Court proceeds to the second step of the five-step analysis.

### B.   Perez Demonstrated "Severe" Mental Impairments That Significantly Limit
### His Ability To Do Basic Work Activities, But Perez Did Not Demonstrate
### "Severe" Physical Impairments

The second step of the analysis is to determine whether Perez proved that he had a

severe impairment or combination of impairments that "significantly limit[ed his] physical or mental

ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work activities

---

[21/]   See also, e.g., 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416.912(d),
416.912(e)(2); Padula v. Astrue, 514 F. App'x 49, 51 (2d Cir. 2013); Winn v. Colvin, 541
F. App'x 67, 70 (2d Cir. 2013); Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008); Perez
v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); Echevarria v. Sec'y of Health & Human Servs., 685
F.2d 751, 755 (2d Cir. 1982); Torres v. Barnhart, 02 Civ. 9209, 2007 WL 1810238 at *9
(S.D.N.Y. June 25, 2007) (Peck, M.J.) (& cases cited therein).

is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).

"Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).  The Second Circuit has warned that the step two analysis may not

do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

"[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed

or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'"

McDowell v. Colvin, No. 11-CV-1132, 2013 WL 1337152 at *6 (N.D.N.Y. Mar. 11, 2013), report

& rec. adopted, 2013 WL 1337131 (N.D.N.Y. Mar. 29, 2013).[22/]

    "A finding that a condition is not severe means that the plaintiff is not disabled, and

the Administrative Law Judge's inquiry stops at the second level of the five-step sequential

evaluation process."  Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19,

---

[22/]    Accord, e.g., Whiting v. Astrue, No. Civ. A. No. 12-274, 2013 WL 427171 at *2 (N.D.N.Y. Jan. 15, 2013) ("'The mere presence of a disease or impairment alone . . . is insufficient to establish disability; instead, it is the impact of the disease, and in particular any limitations it may impose upon the claimant's ability to perform basic work functions, that is pivotal to the disability inquiry.'"), report & rec. adopted, 2013 WL 427166 (N.D.N.Y. Feb. 4, 2013); Lohnas v. Astrue, No. 09-CV-685, 2011 WL 1260109 at *3 (W.D.N.Y. Mar. 31, 2011), aff'd, 510 F. App'x 13 (2d Cir. 2013); Hahn v. Astrue, 08 Civ. 4261, 2009 WL 1490775 at *7 (S.D.N.Y. May 27, 2009) (Lynch, D.J.) ("[I]t is not sufficient that a plaintiff 'establish[] the mere presence of a disease or impairment.'  Rather, 'the disease or impairment must result in severe functional limitations that prevent the claimant from engaging in any substantial gainful activity.'" (citation omitted)); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) ("The mere presence of a disease or impairment is not disabling within the meaning of the Social Security Act.").

1999).  On the other hand, if the disability claim rises above the de minimis level, then the further

analysis of step three and beyond must be undertaken.  See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only

a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to

work.'"  Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154

n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

ALJ Friedman determined that the medical evidence indicated that Perez had the

severe mental impairments of major depressive disorder and PTSD.  (See page 13 above.)  Although

ALJ Friedman's finding regarding the severity of Perez's mental impairments benefits Perez, Perez

contests ALJ Friedman's finding that (1) he also did not suffer additional mental limitations from

his borderline intellectual functioning, and (2) Perez's physical manipulation limitations are not

severe.  (See Dkt. No. 21: Perez Br. at 16-21; Dkt. No. 29: Perez Reply Br. at 1-4.)  Before

proceeding to the third step of the five-part analysis with respect to Perez's depression and PTSD,

the Court first addresses ALJ Friedman's determinations that Perez's intellectual functioning and

manipulation limitations were not severe impairments.

### 1.    Substantial Evidence Supports ALJ Friedman's Determination That Perez's Intellectual and Manipulation Impairments are Non-Severe

ALJ Friedman determined that although "[t]here is evidence of psychiatric

impairments," Perez's intellectual functioning did not amount to an independently severe

impairment.  (See pages 14-15 above.)  ALJ Friedman found that Perez's more recent mental

evaluations did not support a finding that his intellectual functioning constituted an additional severe

impairment.  (R. 32, 34; see page 15 above.)  Perez argues that it was error for ALJ Friedman "to

exclude [the 2007 RBANS test] from consideration based on nothing more than his own estimation

that there was no other evidence to demonstrate that Mr. Perez remained at [a borderline] level of dysfunction." (Dkt. No. 21: Perez Br. at 20.)  Perez further asserts that ALJ Friedman violated his duty to develop the record when he failed to request "additional and comparable psychometric testing to make reasoned findings about what the evidence showed." (Perez Br. at 20.)

Treating physician Dr. Chu determined in June 2010 that Perez's speech was clearly articulated and coherent, and that there was no evidence of impaired attention or concentration. (See page 10 above.)  Dr. Chu determined that Perez had an average fund of knowledge and was of average intelligence, assigning him a GAF score of 60. (See pages 10-11 above.)  In July 2011, Chu assigned Perez a GAF score of 60-65, which is consistent with only mild cognitive symptoms. (See page 11 above.)  Moreover, in 2009, consultative examiner Dr. Meadow described Perez as having a coherent and goal-directed thought process and intact attention and concentration. (See page 9 above.)  Perez was able to repeat three out of three objects immediately and after five minutes during a memory test. (See pages 9 above.)  Dr. Meadow's report concluded that "[t]he results of the exam appear to be consistent with psychiatric problems, but in itself does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (R. 257.)  A therapist at the South Bronx Mental Health Council assigned Perez a GAF score of 55. (See page 10 above.)  The results of Dr. Euler and Nurse Practitioner Back's 2007 RBANS psychological evaluation indicated that Perez suffered from extensive cognitive impairment in the areas of immediate and delayed memory, attention and language, and is of borderline intelligence. (See page 5 above.)  ALJ Friedman assigned "little weight" to these findings because their treatment notes ended in August 2008 and "there is no indication that the severity level of his impairment has remained the same." (R. 34; see also page 15 above.)  Indeed, the evidence shows that Perez's 2007 diagnosis of borderline intelligence occurred when Perez had recently been released from prison, was homeless

and had a history of substance abuse (see page 5 above), and that thereafter Perez's mental evaluations progressively improved, with GAF scores rising from a low of 40 in 2007 to 60-65 most recently in 2011 (see pages 6-7, 11 above).

As to Perez's hand impairments, a 2008 x-ray revealed a healed fracture of the fifth finger on Perez's right hand, with callous formation at the fracture site.  (R. 33; see page 8 above.) The rheumatoid factor was negative.  (See page 8 above.)  ALF Friedman noted that Perez failed to put forth any evidence that he engaged in the prescribed physical therapy.  (R. 33; see page 8 n.7 above.)  These findings are consistent with Dr. Joshi's 2009 evaluation that while Perez was unable to flex the third digit of his left hand and had difficulty flexing the fifth digit in his right hand, Perez's hand and finger dexterity was intact, fine motor activity was preserved, grip strength was a four out of five, and Perez still was able to zip, button, and tie with his left hand.  (R. 33; see pages 11-12 above.)

ALJ Friedman's conclusion as to the extent of both Perez's claimed mental and manipulative impairments also is supported by evidence of Perez's own statements about his daily activities.  (R. 34; see also page 15 above.)  ALJ Friedman gave Dr. Joshi's determination that Perez had a moderate limitation in gripping with this left hand, and pushing, pulling, carrying, and lifting with both hands "little weight" because they were "inconsistent with [Perez's] reported level of functioning."  (R. 33; see page 14 above.)  Perez testified at the hearings that he uses public transportation, goes grocery shopping, and cleans his apartment by himself and cooks simple meals. (See page 4 above.)  Multiple medical evaluations noted that Perez's personal hygiene and grooming were normal.  (See pages 6-7, 9-10 above.)

In light of the foregoing, substantial (although contradicted) evidence supports ALJ Friedman's determination at step two that Perez's intellectual functioning and "status post stab

wounds to the bilateral hands" are non-severe impairments.  (R. 30; see pages 13-14 above.)  See,

e.g., McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 705 (2d Cir. 1980) ("'ALJ has

the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in

light of medical findings and other evidence, regarding the true extent of the pain alleged by the

claimant.'"); Shepard v. Comm'r of Soc. Sec., No. 13-cv-172, 2014 WL 1813150 at *7 (D. Vt. May

7, 2014) ("Nor does the record support [plaintiff's] contention that his left arm impairment was

disabling . . . . As the ALJ noted, although a December 2008 evaluation revealed a markedly

diminished grip strength and other limitations, more recent medical evidence demonstrates that

[plaintiff] improved since then, until in March 2010, he was noted to have normal grip strength and

biceps strength of 4+/5.  In May 2010, [a] psychological consultant . . . recorded that, although

[plaintiff] stated he could not lift heavy objects due to problems with his left elbow, he could reach,

cook, clean his house, use a computer a little, and sit for extended periods of time.  Also in May

2010, after reviewing the relevant evidence, [an] agency consultant . . . found that [plaintiff] had no

manipulative limitations." (record citations omitted)); Whiteside v. Colvin, No. 12-CV-889, 2014

WL 585303 at *8 (W.D.N.Y. Feb. 13, 2014) ("[U]pon review of the record as a whole, the court

finds that the ALJ did not commit legal error by concluding his analysis at step two of the sequential

evaluation, and that there is substantial evidence in the record to support his determination that

plaintiff's impairments, considered alone or in combination, are not 'durationally severe.'"); Crayton

v. Astrue, 944 F. Supp. 2d 231, 234-35 (W.D.N.Y. 2013) ("Plaintiff challenges the ALJ's assessment

of her exertional limitations . . . . The ALJ rejected [the treating physician's] opinion [that plaintiff

could 'never' twist, stoop, crouch, squat, climb ladders, grasp, turn or twist objects with her hands]

on the grounds that it was unsupported by medical evidence in the record, and was inconsistent with

the opinions of other treating and examining physicians, and plaintiff's own reports of her physical

activities. . . . A report by [an] examining physician . . . noted that plaintiff had . . . intact hand and finger dexterity and 5/5 grip strength, despite tenderness in both wrists.  Plaintiff's self-reported activities of daily living, including reading books, dressing herself and attending to personal hygiene, loading and unloading laundry from the washer and dryer, grocery shopping and performing light housework, also conflict with [the treating physician's] opinion that plaintiff can 'never' stoop, crouch, squat, or handle items with her hands. . . . Balancing these factors, I find that the ALJ's rejection of [the treating physician's] opinion concerning plaintiff's exertional limitations was proper." (record citation omitted)); Harris v. Astrue, 935 F. Supp. 2d 603, 608 (W.D.N.Y. 2013) ("For example, the ALJ noted that plaintiff's reported activities of daily living were not as restricted as would be expected from someone claiming complete disability.  Specifically, plaintiff acknowledged that he personally engaged in cooking, cleaning, shopping, and doing laundry, and he further reported to doctors . . . that he had no problems performing those activities.  The ALJ also observed that plaintiff stated that he had no trouble with personal grooming or getting dressed. . . . Based on this evidence, the ALJ concluded that plaintiff's physical limitations are not as severe as plaintiff alleges.  I concur with this judgment." (record citation omitted)), aff'd, No. 13-2168-cv, --- F. App'x ----, 2014 WL 1327889 (2d Cir. Apr. 4, 2014); Ortiz v. Astrue, 875 F. Supp. 2d 251, 261-62 (S.D.N.Y. 2012) ("medical reports present[ing] consistent and reiterative findings" sufficiently supported a finding of not disabled where subjective complaints were inconsistent with activities of daily living);  Impala v. Astrue, No. 10-cv-505, 2011 WL 2456356 at *2, *5 (D. Conn. June 15, 2011) ("The ALJ considered the plaintiff's alleged impairments, but the objective medical evidence showed that those conditions were not severe.  The ALJ accordingly ended his analysis at step two of the sequential evaluation process and concluded that the plaintiff was not disabled. . . . [T]he ALJ's determination was proper." (record citation omitted)), aff'd, 477 F. App'x 856 (2d Cir. 2012);

Mitchell v. Astrue, No. 10 CV 902, 2011 WL 9557276 at *13 (D. Conn. May 24, 2011) (affirming the Commissioner's decision where, "[a]t step two of the sequential analysis, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities . . . and thus plaintiff did not have a 'severe' impairment"), report & rec. adopted, 2012 WL 6155797 (D. Conn. Dec. 11, 2012).

### 2.     ALJ's Friedman's Decision Not to Solicit an Additional Consultative Intelligence Evaluation Did Not Constitute Reversible Legal Error

"A consultative examination is used to 'try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision' on the claim."  Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 32 (2d Cir. 2013) (quoting 20 C.F.R. §§ 404.1519a(b), 416.919a(b)).  "However, an ALJ is not required to order a consultative examination if the facts do not warrant or suggest the need for it."  Tankisi v. Comm'r of Soc. Sec., 521 F. App'x at 32.

The medical evidence of record was sufficient for ALJ Friedman to determine whether Perez's intellectual functioning was a severe impairment.  As discussed above, the record contains ample evidence from numerous evaluations, including those by a treating physician that was far more contemporaneous with Perez's filing than the 2007 RBANS test, that indicate that Perez's cognitive impairment was not severe.  (See pages 8-11 above.)[23/]  In any event, as in Tankisi,

---

[23/]     Contrary to Perez's assertion, ALJ Friedman did not "exclude" the 2007 RBANS results and replace them with "his own estimation" of Perez's level of dysfunction.  (Dkt. No. 21: Perez Br. at 20.)  Rather, ALJ Friedman gave "little weight" to the report's finding because it was four years removed from Perez's filing and because there were four additional evaluations that indicated a level of functioning inconsistent with the RBANS result.  (See page 15 above.)  Indeed, the most recent evaluation by treating physician Dr. Chu occurred just one month before Perez filed for benefits and indicated a GAF score of 60-65, which was consistent with Perez's progressively increasing levels of functioning after release from
(continued...)

Perez's cognitive limitations were incorporated into ALJ Friedman's RFC determination, finding that Perez could perform "low stress, simple work that allows for occasional contact with supervisors and co-workers, and minimal contact with the general public." (R. 31.)  See Tankisi v. Comm'r of Soc. Sec., 521 F. App'x at 32 ("The record does not suggest any further limitation that would necessitate a consultative intelligence examination.").  Accordingly, the Court concludes that ALJ Friedman had adequate information in the existing record to decide this case without a consultative intelligence examination.  See, e.g., Washington v. Astrue, No. 12–CV–39, 2012 WL 6044877 at *2-3 (N.D.N.Y. Dec. 5, 2012) (the ALJ did not err in failing to order a consultative intelligence examination, in part because the consultative psychologist reported that, despite the fact that plaintiff's intellectual functioning was in the borderline to low average range, she could follow and understand simple directions and instructions and maintain attention and concentration fairly well); Battaglia v. Astrue, No. 11 Civ. 2045, 2012 WL 1940851 at *10 (E.D.N.Y. May 29, 2012) ("Based on the circumstances of this case and the psychiatric evidence in the record, the ALJ properly concluded that a consultative examination was not necessary here. . . . [T]he evidence concerning plaintiff's mental health was not in conflict, inconsistent, ambiguous, or insufficient for the ALJ to make a disability determination.  As previously noted, psychiatric records . . . showed that plaintiff at times complained of anxiety and depression and was diagnosed with general anxiety disorder, but she was well-nourished, well-groomed, and showed no evidence of thought disorder or psychosis. These impressions are consistent both with the treatment notes of [a treating physician] and with plaintiff's intermittent use of Zoloft and Paxil. . . . In light of these facts, the ALJ was not required to order a consultative psychiatric examination in order to fully develop the record."); Lefever v.

---

[23]/        (...continued)
        prison in 2006, when the RBANS test was performed.  (See page 11 above.)

Astrue, No. 07-CV-622, 2010 WL 3909487 at *7-8 (N.D.N.Y. Sept. 30, 2010) ("Plaintiff also argues that the ALJ had a duty to request a retrospective opinion from plaintiff's mental health providers . . . . Plaintiff has not alleged that there are gaps in plaintiff's medical history and . . . [t]he evidence received from the treating physicians was adequate and allowed the ALJ to make a determination as to disability."), aff'd, 443 F. App'x 608 (2d Cir. 2011).

### C.      Perez Did Not Have A Disability Listed In Appendix 1 Of The Regulations

The third step of the five-step test requires a determination of whether Perez had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Friedman evaluated Perez against the criteria in Listing 12.04 (Affective Disorders) and Listing 12.06 (Anxiety Related Disorders).  ALJ Friedman found that "[t]he severity of [Perez's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06."  (R. 30; see page 14 above.)  In order to qualify for a disability, Perez's depression and PTSD must qualify as affective disorders or anxiety related disorders.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.

Section 12.04 defines affective disorder, as an impairment:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one of the following:

1.  Depressive syndrome characterized by at least four of the following:

a.  Anhedonia or pervasive loss of interest in almost all activities; or

b.  Appetite disturbance with change in weight; or

c.  Sleep disturbance; or

d.  Psychomotor agitation or retardation; or

e.  Decreased energy; or

f.  Feelings of guilt or worthlessness; or

g.  Difficulty concentrating or thinking; or

h.  Thoughts of suicide; or

i.  Hallucinations, delusions, or paranoid thinking; or

2.  Manic syndrome . . . :

. . .

or

3.  Bipolar syndrome . . . ;

AND

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration;

OR

C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.  Repeated episodes of decompensation, each of extended duration; or

2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

Similarly, section 12.06 describes conditions required to demonstrate anxiety-related

disorders:

In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A.  Medically documented findings of at least one of the following:

1.  Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a.  Motor tension; or

b.  Autonomic hyperactivity; or

c.  Apprehensive expectation; or

d.  Vigilance and scanning;

or

2.  A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3.   Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4.  Recurrent obsessions or compulsions which are a source of marked distress; or

5.   Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

OR

C.  Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

ALJ Friedman determined that Perez suffers from major depressive disorder and PTSD.  (R. 30; see page 13 above.)  Presumably, that means that ALJ Friedman found that Perez satisfied § 12.04(A) and § 12.06(A).

With regard to the B criteria for the above disorders, however, ALJ Friedman found that Perez's "mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration."  (R. 31.) Specifically, ALJ Friedman determined that Perez had only mild restriction in activities of daily

living, moderate difficulties in social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration.  (R. 31.)  ALJ Friedman also determined that Perez failed "to establish the presence of the 'paragraph C' criteria as [Perez] does not have repeat episodes of decompensation and is able to function independently outside of a structured setting."  (R. 31.)

ALJ Friedman's findings are supported by the objective medical evidence.  ALJ Friedman primarily relied on the reports from consultative examiners Dr. Meadow and Dr. Joshi. (R. 31.)  Dr. Meadow found that Perez's thought process was coherent and goal-directed, with intact attention and concentration.  (See page 9 above.)  Dr. Meadow determined that Perez's cognitive functioning was average with a general fund of knowledge appropriate to Perez's experience.  (See page 9 above.)  In contrast with Dr. Euler and Nurse Practitioner Back's assessment that Perez had an extensive cognitive impairment in the areas of immediate and delayed memory (see page 6 above), Perez repeated three out of three objects immediately and after five minutes during a memory test (see page 9 above).  Dr. Meadow also noted that Perez took care of his personal hygiene, did household chores and socialized with friends.  (See page 9 above.)  While Dr. Meadow noted that "[t]he results of the exam appear to be consistent with psychiatric problems," he concluded that the problems "do[] not appear to be significant enough to interfere with [Perez's] ability to function on a daily basis."  (R. 257; see page 9 above.)  Additionally, Dr. Joshi's report indicates, and Perez's testimony and statements to doctors show, that he lives alone, maintains his personal hygiene, cleans his house, cooks (albeit minimally), and takes public transportation independently, indicating his ability to function outside of a highly supportive living arrangement and to adjust to the demands of daily activities.  (R. 260; see pages 11 above.)

Accordingly, substantial evidence supports ALJ Friedman's determination that Perez's mental impairments did not satisfy the listing requirements.  See, e.g., Paulino v. Colvin, 13 Civ. 3718, 2014 WL 2120544 at *15-16 (S.D.N.Y. May 13, 2014) (Peck, M.J.); Paulino v. Astrue, 08 Civ. 2813, 2010 WL 3001752 at *20-21 (S.D.N.Y. July 30, 2010) (Peck, M.J.) (substantial evidence supports ALJ determination that mental impairment did not meet § 12.04 listing requirements where review psychologist determined claimant "had moderate difficulties in maintaining concentration, but only mild restriction of daily activities and mild difficulties in maintaining social functioning" and where claimant "testified that she can feed, bathe, and dress herself, and use certain forms of transportation independently"); Rosado v. Astrue, 713 F. Supp. 2d 347, 364 (S.D.N.Y. 2010) (Peck, M.J.) (substantial evidence supports ALJ determination that mental impairment did not meet § 12.04 or § 12.06 listing requirements where psychiatrist noted claimant's independence and claimant's "own testimony and actions demonstrate his ability to function independently outside the area of his home"); Gibbs v. Astrue, 07 Civ. 10563, 2008 WL 2627714 at *20-21 (S.D.N.Y. July 2, 2008) (Peck, M.J.) (substantial evidence supports ALJ determination that mental impairment did not meet § 12.04 or § 12.06 listing requirements where doctor noted claimant "had no restrictions of activities of daily living" or "social functioning," and where claimant testified that she cooks, shops, "helps her children with their homework," and uses public transportation, which showed she "could function independently outside the area of her home"), report & rec. adopted, 2008 WL 4620203 (S.D.N.Y. Oct. 16, 2008).

Indeed, Perez -- who is represented by experienced counsel -- does not claim that any of his impairments meet or equal a listed condition.  (See Dkt. No. 21:  Perez Br. at 16-21; Dkt. No. 29: Perez Reply Br. at 1-4.)

Before proceeding to step four, however, the Court will address ALJ Friedman's credibility and residual functional capacity determinations.

## 1.    Credibility Determination

Because subjective symptoms like pain only lessen a claimant's residual functional capacity ("RFC") where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.' Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.").[24]   In

---

[24]    See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] (continued...)

addition, "courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[25/]

ALJ Friedman considered Perez's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and determined that Perez's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Perez's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment."  (R. 31-32.)[26/]

---

[24/]  (...continued)
to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26,  2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[25/]  Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

[26/]  This Court, and others, previously have criticized ALJ decisions that "[d]etermin[e] the RFC
(continued...)

When ruling that a claimant is not entirely credible, the ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p, 1996 WL 374186 at *4 (July 2, 1996).  The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.  The ALJ must consider statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted).[27]

---

26/   (...continued)
first and then measur[e] the claimant's credibility by that yardstick," as "illogical" and "prejudicial to the claimant."  Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *15-16 (S.D.N.Y. July 2, 2013) (Peck, M.J.) (& cases cited therein), report & rec. adopted, 2014 WL 774966 (S.D.N.Y. Feb. 21, 2014); see also, e.g., Paulino v. Colvin, 13 Civ. 3718, 2014 WL 2120544 at *17 n.18 (S.D.N.Y. May 13, 2014) (Peck, M.J.); Givens v. Colvin, 13 Civ. 4763, 2014 WL 1394965 at *10 n.18 (S.D.N.Y. Apr. 11, 2014) (Peck, M.J.).  Nevertheless, while ALJ Friedman's language leaves something to be desired, here unlike in Cruz, he gave sufficient explanation for finding that Perez's claimed limitations due to his depression and PTSD lack credibility—including careful review of the contrary medical evidence and Perez's testimony indicating that he lives alone, cleans, cooks, socializes with friends, and takes public transportation—that the Court concludes the ALJ's finding is supported by substantial evidence and a remand is not called for.  See, e.g., Givens v. Colvin, 2014 WL 1394965 at *10 n.18.

27/   Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue, 465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-7p, 1996 WL 374186 at *2.

ALJ Friedman properly applied this two-step process to Perez's case.  (R. 31-34.)[28/]

First, ALJ Friedman assessed Perez's credibility by considering all of the relevant medical evidence in the record.  (R. 31.)  ALJ Friedman found that the record reflected that Perez's "depressive disorder and P[TS]D" made him "lethargic" and "anxious," with "some paranoid ideation and preoccupations."  (R. 33-34; see page 15 above.)  However, the record also reflected that "[h]is memory was normal," and that his GAF "was 55, indicating moderate impairment i[n] functioning."  (R. 34; see page 15 above.)  ALJ Friedman noted that subsequent treatment notes from Dr. Chu "indicate[d] that [Perez's] GAF improved, but remained in the moderate range," i.e., 60-65.  (R. 34; see page 15 above.)  Dr. Meadow's psychiatric evaluation indicated appropriate affect in speech and thought content, adequate manner of relating, intact attention, concentration and memory, and fair insight and judgment.  (R. 34; see page 9 above.)  Rejecting one extreme of the medical evidence, ALJ Friedman gave "little weight" to Dr. Meadow's conclusion that Perez was "able to perform all tasks necessary for vocational functioning" as it did not consider Perez's subjective complaints, and Dr. Meade's conclusion that Perez "does not have a severe [mental] impairment" because "it is inconsistent with the record as a whole."  (R. 34, emphasis added; see page 15 above.)  The ALJ also gave "little weight" to Dr. Euler and Nurse Practitioner Back's determination that Perez has a "poor ability to perform work related me[n]tal activities" because Perez's "activities of daily living do not support limited function," and "there is no indication that the severity level of [Perez's mental] impairment . . . remained the same."  (R. 34; see page 15 above.)  Second, ALJ Friedman relied on Perez's own testimony that "he is independent with all activities of daily living, instrumental

---

[28/]   Indeed, Perez's major pain complaint was related to his back (see pages 3-4 above), a condition that the ALJ (and Appeals Counsel on the prior appeal) found not to even be a severe impairment, and Perez's counsel does not challenge that determination here.  (See Dkt. No. 21: Perez Br. at 16-21; Dkt. No. 29: Perez Reply Br. at 1-4.)

activities, and executive functions" and that Perez "receives bi-weekly therapy and monthly psychiatric treatment." (R. 34; see page 4 above.) Both Dr. Meadow and Dr. Joshi reported that Perez maintains his personal hygiene, cleans his house, cooks, does laundry, and takes public transportation independently, indicating his ability to function outside of a highly supportive living arrangement and to adjust to the demands of daily activities. (R. 33-34; see pages 9, 11 above.) While Perez subjectively alleged hand pain of seven out of ten (see page 11 above), that was inconsistent with the medical evidence, which indicated that his grip strength was four out of five and that he could zip, button and tie (see page 12 above). Moreover, once Perez's hands had healed, he received no further medical treatment for them. (See page 8 n.7 above; see also Dkt. No. 26: Gov't Br. at 18-19.)

Thus, ALJ Friedman met his burden in finding Perez's subjective complaints of pain were not entirely credible because the objective medical evidence failed to support his claims of disability based on his depression and PTSD and his manipulative limitations. See, e.g., Hilliard v. Colvin, 13 Civ. 1942, 2013 WL 5863546 at *15 (S.D.N.Y. Oct. 31, 2013) (Peck, M.J.) (The "ALJ . . . met his burden in finding [plaintiff's] claims not entirely credible because she remains functional in terms of activities of daily living and the objective medical evidence fails to support her claims of total disability based on pain." (citations omitted)); see also, e.g., Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding . . . where the ALJ identified specific record-based reasons for his ruling"); Rutkowski v. Astrue, 368 F. App'x 226, 230 (2d Cir. 2010) (ALJ adequately supported credibility finding when he noted that "substantial evidence existed showing that [plaintiff] was relatively 'mobile and functional,' and that [plaintiff's] allegations of disability contradicted the broader evidence"); Givens v. Colvin, 2014 WL 1394965 at *10-11 (ALJ properly found claimant's disability claims not entirely credible where claimant

"admitted that he was capable of performing many day-to-day activities, such as reading, watching television, caring for his personal needs, using public transportation, and going to church"); Crayton v. Astrue, 944 F. Supp. 2d 231, 235 (W.D.N.Y. 2013) ("Plaintiff also challenges the ALJ's finding that plaintiff's complaints of disabling pain were not wholly credible. . . . Here, the ALJ rejected plaintiff's testimony based on several inconsistencies. . . . [P]laintiff's complaints of disabling pain appear to conflict with her medical treatment records, which reflect few complaints and no aggressive or additional treatment for back, knee and wrist pain . . . . For example, plaintiff listed, among her activities of daily living, dressing and caring for herself, performing light housework and grocery shopping, and stated that she could lift ten pounds . . . . Given the inconsistencies between plaintiff's reports of disabling pain, other testimony by plaintiff and the rest of the record, I find no basis to disturb the ALJ's findings as to plaintiff's credibility."); Gillard v. Colvin, No. 11-cv-1173, 2013 WL 954909 at *5 (N.D.N.Y. Mar. 12, 2013) (Plaintiff "next asserts that the ALJ erred in assessing his credibility by improperly concluding that his activities of daily living, including smoking . . . undercut his claims of disability.  The court disagrees. . . . As the ALJ explained, [plaintiff's] claims of limitation were belied by [his] . . . activities of daily living includ[ing] showering, bathing, and dressing himself, preparing microwave meals, watching television, listening to the radio, reading, and socializing.  Further, [plaintiff] smokes daily, which the ALJ observed requires manipulative and fine motor activity, despite his allegations of limitation in the use his of hands and fingers.  In sum, the ALJ's credibility determination was sufficiently articulate and based on substantial evidence and is, therefore, conclusive." (record citations omitted)); Ashby v. Astrue, 11 Civ. 2010, 2012 WL 2477595 at *15 (S.D.N.Y. Mar. 27, 2012) ("in making his credibility assessment, the ALJ appropriately considered Plaintiff's ability to engage in certain daily activities

as one factor, among others suggested by the regulations"), <u>report & rec. adopted</u>, 2012 WL 2367034 (S.D.N.Y. June 20, 2012).

### 2.    **Residual Functional Capacity Determination**

ALJ Friedman found that Perez "has the residual functional capacity to perform . . . low stress, simple work that allows for occasional contact with supervisors and co-workers, and minimal contact with the general public." (R. 31.)  In making this determination, ALJ Friedman considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, . . . [including] opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (R. 31.)

ALJ Friedman's conclusion is supported by treating physician Dr. Chu's findings that Perez had no difficulty with concentration or attention and had an average fund of knowledge with average intelligence. (R. 34; <u>see</u> page 10 above.)  Dr. Chu's most recent evaluation noted that Perez seemed less anxious and less irritable.  (<u>See</u> page 11 above.)  Perez's GAF score increased from 60 to 60-65 between June 2010 and July 2011.  (R. 34; <u>see</u> page 11 above.)  Although Dr. Euler and Nurse Practitioner Back's 2007-08 records included an RBANS test which indicated that Perez suffered from extensive cognitive impairment and borderline intelligence, ALJ Friedman afforded their findings "little weight" because they were inconsistent with the other (and more recent) medical evidence showing that Perez's level of functioning steadily increased over time.  (R. 34; <u>see</u> page 15 above.)  ALJ Friedman also considered the multiple reports detailing Perez's ability to engage in daily activities, such as cooking, cleaning, doing laundry, and shopping.  (R. 33; <u>see</u> pages 6-7, 9-10 above.)

Accordingly, the Court finds that ALJ Friedman's assessment that Perez had the capacity to perform "low stress, simple work that allows for occasional contact with supervisors and co-workers, and minimal contact with the general public" (see page 14 above) is supported by substantial evidence.

**D.      Perez Has No Past Relevant Work**

The fourth prong of the five part analysis asks whether Perez had the residual functional capacity to perform his past relevant work.   (See page 19 above.)   ALJ Friedman concluded that Perez had "no past relevant work."  (R. 34; see page 15 above.)  This finding is not disputed, so the Court proceeds to the fifth and final step of the analysis.

**E.      There Was Sufficient Evidence To Support The ALJ's Finding That Jobs Exist in Significant Numbers in the National Economy That Perez Can Perform**

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).[29/]

In meeting his burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid."  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the

---

[29/]     See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).  "The Grid classifies work into five categories based on the exertional requirements of the different jobs.  Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20 C.F.R. § 404.1567.  Taking account of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled."  20 C.F.R. § 404.1569; 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(a).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations."  Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), report & rec. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.' Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing Bapp)); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting Zabala)).

ALJ Friedman determined that Perez's "ability to perform work at all exertional levels has been compromised by nonexertional limitations." (R. 35.) ALJ Friedman elicited testimony from a vocational expert instead of simply relying on the Grid. (See page 13 above.) Specifically, ALJ Friedman "asked the vocational expert whether jobs exist in the national economy for an individual with [Perez's] age, education, work experience, and residual functional capacity," i.e., an individual limited to low stress, simple work that required only occasional contact with supervisors and co-workers and minimal contact with the public. (R. 35-36.) This limitation to "simple work" incorporated Perez's PTSD as well as his borderline intelligence. (See Dkt. No. 26: Gov't Br. at 15.) The vocational expert testified that "given all of these factors, the individual would be able to

perform the requirements of a variety of representative occupations such as Office cleaner light (DOT 323-687.014), of which there are 1.5 million jobs available nationally and 30,230 jobs available regionally."  (R. 35; see page 13 above.)[30/]

Perez challenges ALJ Friedman's finding because "Perez lacks the capacity to meet the demands of this job," which includes "performing frequent reaching and handling."  (Dkt. No. 21: Perez Br. at 21.)  Perez principally relies on Dr. Joshi's report, which concluded that Perez was unable to flex the third digit on his left hand, had difficulty flexing the fifth digit on his right hand, had moderate limitation in gripping with his left hand, and had moderate limitation in pushing, pulling, carrying and lifting with both hands.  (R. 261-62; see page 12 above.)  However, Dr. Joshi's report does not support Perez's argument.  First, Dr. Joshi did not find that Perez had any limitation in reaching; rather, Dr. Joshi found only a moderate limitation in gripping in his left hand and no such limitation in his right hand.  (See page 12 above.)  Second, the office or house cleaner job was

---

[30/]     A vocational expert can provide evidence regarding the existence of jobs in the economy and a particular claimant's functional ability to perform any of those jobs.  20 C.F.R. §§ 404.1566(e), 416.966(e); see, e.g., Calabrese v. Astrue, 358 F. App'x 274, 275-76 (2d Cir. 2009); Butts v. Barnhart, 416 F.3d at 103-04; Taylor v. Barnhart, 83 F. App'x 347, 350 (2d Cir. 2003); Jordan v. Barnhart, 29 F. App'x 790, 794 (2d Cir. 2002); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988); Dumas v. Schweiker, 712 F. 2d 1545, 1553-54 (2d Cir. 1983); DeJesus v. Astrue, 762 F. Supp. 2d 673, 693 n.20 (S.D.N.Y. 2011) (Peck, M.J.); Quezada v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 n.20 (S.D.N.Y. June 15, 2007) (Peck, M.J.); Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *18 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sept. 12, 2006); de Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *17 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Bosmond v. Apfel, 97 Civ. 4109, 1998 WL 851508 at *8 (S.D.N.Y. Dec. 8, 1998); Fuller v. Shalala, 898 F. Supp. 212, 218 (S.D.N.Y. 1995) (The "vocational expert, . . . provided several examples of unskilled . . . jobs that are available in the national and local economies for a person with [plaintiff's] condition, age, education, and work experience. . . . Accordingly, the Secretary satisfied her burden of showing that such jobs exist in the national economy.").

only illustrative; the vocational expert testified that many other jobs existed that would fit the ALJ's hypothetical.  (R. 17; see page 13 above.)

In any event, having reasonably determined that Perez did not have a severe physical manipulative impairment, ALJ Friedman was not required to include a gripping or handling limitation in his hypothetical.  See, e.g., Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 35 (2d Cir. 2013) (Plaintiff "correctly notes that there must be substantial evidence to support the hypotheticals put to the vocational expert.  However, given our conclusion above that the ALJ's RFC finding was supported by substantial evidence, we see no error in the ALJ's questioning or in his use of the resulting testimony." (citation omitted)); Boni-Phillips v. Comm'r of Soc. Sec., No. 11-CV-1071, 2014 WL 1312071 at *8 (N.D.N.Y. Mar. 31, 2014) ("Despite Plaintiff's argument to the contrary, this hypothetical was proper because there was substantial evidence to support its underlying assumptions.  Therefore, the ALJ was justified in adopting the vocational expert's conclusion . . . ." (citation omitted)); Brown v. Comm'r of Soc. Sec., 13 Civ. 827, 2014 WL 783565 at *21 (S.D.N.Y. Feb. 28, 2014); Hollenbeck v. Comm'r of Soc. Sec., No. 12-CV-1240, 2013 WL 3712441 at *18 (N.D.N.Y. July 12, 2013); Jones v. Astrue, No. 11-CV-5757, 2013 WL 802778 at *4 (E.D.N.Y. Mar. 5, 2013) (Plaintiff "argues that the vocational expert's testimony cannot constitute substantial evidence supporting the ALJ's disability determination because it was given in response to a flawed hypothetical.  Specifically, [plaintiff] contends that the ALJ's proffered hypothetical incorporated an incorrect RFC that failed to take into account [plaintiff's] mental impairments.  However, this Court has already concluded that the ALJ's RFC determination properly considered [plaintiff's] physical and mental impairments and was based upon substantial evidence.  Accordingly, the ALJ's reliance upon the vocational expert's testimony was proper.").

## **CONCLUSION**

For the reasons discussed above, the Commissioner's determination that Perez was not disabled within the meaning of the Social Security Act is supported by substantial evidence. Accordingly, the Commissioner's cross-motion for judgment on the pleadings (Dkt. No. 25) is GRANTED and Perez's motion for judgment on the pleadings (Dkt. No. 20) is DENIED.

SO ORDERED.

Dated:       New York, New York
             June 2, 2014

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to:       All Counsel